IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|       Plaintiff, | ) | |
| | ) | |
|       vs. | ) | Civil Action No. 06-656 |
| | ) | Judge Cercone |
| RICHARD W. EPSTEIN, ESQ. | ) | Magistrate Judge Mitchell |
|       Defendant and Third-Party | ) | |
|       Plaintiff, | ) | |
| | ) | |
|       vs. | ) | |
| | ) | |
| LESLIE A. MCMONAGLE, | ) | |
|       Third-Party Defendant. | ) | |

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Plaintiff (Docket No. 25) be granted.

II.     Report

Plaintiff, the United States of America, brings this action under the Federal Employees

Compensation Act, 5 U.S.C. §§ 8101-93 (FECA), alleging that Defendant, Richard W. Epstein,

Esquire, improperly disbursed the proceeds of a third-party recovery of a FECA recipient without

either satisfying the interests of the United States in the recovery of $114,794.50 or assuring

satisfaction of those interests.  Epstein has filed a third-party complaint against the FECA

recipient, his former client Leslie A. McMonagle.

Presently before this Court for disposition is a motion for summary judgment, brought by

the Plaintiff.  For the reasons that follow, the motion should be granted.

Facts

Leslie McMonagle was injured on February 9, 1996, during the course of her duties as a

United States Postal Service ("USPS") letter carrier.  She filed for FECA benefits on February

13, 1996, and was subsequently awarded FECA medical and wage-loss benefits for those

injuries, which she began receiving from the Office of Workers' Compensation Programs

(OWCP).  (Compl. ¶ 10;[1] Answer ¶ 10;[2] Pl.'s App. Ex. 1, Attachment A at 1-4.[3])

Sometime thereafter, Ms. McMonagle initiated a third-party suit against Bell Atlantic in

the Court of Common Pleas of Mercer County, Pennsylvania for the work-related injuries she

sustained on February 9, 1996.  (Pl.'s App. Ex. 1, Attachment B.)  Ronald Rice, an Ohio

attorney, originally represented Ms. McMonagle in the third-party action.  Subsequently, Rice

retained Richard Epstein as local counsel.  (Pl.'s App. Ex. 1, Attachment B.)  By letters dated

April 8, 1998 and November 19, 1998, respectively, Rice and Epstein were informed of their

duties under 5 U.S.C. § 8132.  (Pl.'s App. Ex. 1, Attachment C.)  Epstein states that, after some

discovery and prior to the matter being listed for trial, the parties determined that mediation was

in everyone's best interest and a session was scheduled before the late David Ward Murphy for

May 17, 2000.  (Def.'s Br. at [3].)[4]

By letter dated May 17, 2000, David Grubb, a Human Resources Specialist with the

USPS, notified Epstein that, as of that date, the Department of Labor ("DOL") had disbursed a

_____

[1]      Docket No. 1.

[2]      Docket No. 4.

[3]      Docket No. 26.

[4]      Docket No. 30.

total of $172,191.75 in wage-loss and medical benefits on behalf of Leslie McMonagle.  (Pl.'s

App. Ex. 1, Attachment D.)  Epstein states that, on May 17, 2000, he informed Grubb by phone

and fax that it was imperative that he or another representative from the USPS be present or

available by phone for the mediation (rescheduled for May 19) in order to assure that the

government's lien would be resolved to its satisfaction.  (Epstein Aff. at 1.)[5]  He states that he

was unable to communicate with any government representative at the mediation.  (Id.)

On May 19, 2000, Epstein negotiated a monetary settlement on behalf of Leslie

McMonagle and her husband William McMonagle against Bell Atlantic.  The settlement had a

present value of $700,000 with $630,000 attributed to Leslie McMonagle and $70,000 to

William McMonagle for consortium.  The settlement was structured, with $230,000 being paid

up front and guaranteed payments of $826,782 ($2,755.94 per month) commencing November

25, 2000.  (Pl.'s App. Ex. 1, Attachments E, F, G; Epstein Aff. at 2; Epstein Dep. at 31-33.[6])

Epstein states that, on the next business day (May 22, 2000), he faxed the terms of the

proposed settlement and a Third Party Statement of Recovery to Grubb for his review and

approval.  (Epstein Aff. at 1.)  Epstein further states that:

> In response to my repeated calls, Mr. Grubb voiced no objections to any of the
> terms of the settlement or the amount of the upfront cash, but stated he would
> need clarification of how the lien would be handled in a structured settlement.  He
> also asked me to fax the terms of the settlement and statement of recovery to legal
> counsel for the Postal Service, Arthur Kramer, which I did on June 5, 2000.

(Epstein Aff. at 2.)  Epstein's June 5, 2000 facsimile to Arthur Kramer of the USPS Law

Department set forth the terms of the structured settlement, which he described as "$230,000.00

---

[5]      Def.'s Br. (Docket No. 30), following Lindsay affidavit [pp. 115-17].

[6]      Pl.'s Br. Ex. 2.

up front cash and $2,755.94 monthly commencing 11/25/00 and 300 months guaranteed life

thereafter." (Pl.'s App. Ex. 1, Attachment F.)

Epstein states that:

> In my repeated conversations with Mr. Grubb, from May 22, 2000 until June 21, 2000, I told him that I intended to settle the case, subject to the government's approval, for $630,000.00 consisting of an upfront payment of $230,000.00 and guaranteed payments of $826,782.00 ($2,755.94/month commencing 11/25/2000). Since neither Mr. Grubb nor Mr. Kramer ever voiced any objection to the terms of the settlement or my statement of recovery, and there were more than sufficient funds to assure satisfaction of the government's lien ($114,794.50) from future compensation or the guaranteed payments ($826,782.00), my clients executed a release on June 21, 2000.

(Epstein Aff. at 2.)

By letter dated July 12, 2000, Epstein sent Grubb the settlement sheet, a proposed Third

Party Statement of Recovery, and his then firm's escrow check for $7,160.63. The proposed

Third Party Statement of Recovery computed the refund using $230,000 up-front cash received

as the gross recovery and not the present value of the settlement ($630,000). (Pl.'s App. Ex. 1,

Attachment H; Epstein Aff. at 2.)

Epstein states that Ms. McMonagle began receiving structured settlement payments of

$2,755.09 per month beginning November 25, 2000. (Def.'s Resp. Pl.'s Concise Statement

¶ 19.)[7] On April 18, 2001, Arthur Kramer sent Epstein a letter explaining that he had

miscalculated the amounts in his Third Party Statement of Recovery. Kramer stated that Epstein

had two options: 1) report the amount of the initial payment plus the present value of the money

scheduled to be paid in the future; or 2) report the initial cash payment as a partial recovery and

complete another Statement of Recovery form each time another payment was received from the

---

[7]      Docket No. 29.

third-party tortfeasor.  According to Kramer's calculations, the amount to be refunded to the

government as of that date was $133,830.99 and the surplus was $129,994.45.  Kramer returned

the check for $7,160.63 to Epstein.  (Pl.'s App. Ex. 1, Attachment I.)

      Epstein responded to Kramer's letter on April 24, 2001 as follows:

> Your April 18, 2001 letter was surprising in light of the fact that my client and I
> kept [USPS] fully informed of the structured settlement ... the settlement was
> effectuated approximately one year ago and all up front cash distributed and
> disbursed at that time.  Our fee agreement, the settlement sheet, and the Third
> Party Statement of Recovery clearly provide for full payment of attorney's fees at
> the time of settlement.  You have provided no legal authority and we know of no
> legal authority that your lien takes priority over the legal fees which created the
> subrogation fund.  We have heard absolutely nothing from [USPS] throughout the
> past year....  This being said, we have always recognized your subrogation lien and
> our responsibilities, and in light of our correspondence and conversations fully
> expected that it would be recovered from the future payments to plaintiff and/or
> from suspension of [USPS's] obligation to make future payments.  Please call me
> to discuss how we implement this option and come to an amicable resolution of
> this matter.  Thank you for your cooperation in this regard.

(Pl.'s App. Ex. 1, Attachment J.)

      On June 8, 2005, Gertrude Gordon, Chief of the Subrogation Unit, DOL, Office of the

Solicitor, Federal Employees' and Energy Workers' Compensation Division, wrote Epstein a

letter stating as follows:

> This claim has been referred to our office for collection.  We were unable to
> accept the Statement of Recovery and check that you submitted on July 12, 2000,
> because it incorrectly computed the amount of attorneys' fees due.  Since then,
> [USPS] has sent you numerous letter requesting a revised Statement of Recovery
> and refund of the Government's lien, to which you have not responded.  You and
> your client owe the Government $133,157.46, and the purpose of this letter is to
> demand that payment be made immediately.
>
> ...
>
> The Government lien is calculated based on *each and every payment* you and your
> client receive in settlement of the case.  Therefore, when you received the lump
> sum payment of $230,000, you were required to fill out Form 2556 related to that

amount only and submit the refund.  You were not permitted, at that time, to calculate your attorney's fees based upon the entire value of the settlement when the remaining value had yet to be paid.

As of today, your client has received $230,000 in the initial cash payment of her settlement, and [$151,576.70][8] in the ensuing monthly payments.  Enclosed you will find two Statements of Recovery based upon the amounts your client has received.  You and your client currently owe the Government $133,157.46 ($79,209.61 based on the original cash settlement and $53,947.85 based on the monthly payments already received.)  You both continue to owe the Government a refund for each month that payment is received.

If we do not receive payment, or reach an agreement concerning payment, within 30 days of the date of this letter, we will begin charging interest on this debt at the current U.S. Treasury Bill rate.  Interest will begin to accrue as of the date of this letter.  Interest charges will be waived, however, if payment is received within 30 days.

(Pl.'s App. Ex. 1, Attachment I.)

Shortly thereafter,[9] Orlando J. Pannocchia, Acting Deputy Associate Solicitor with the

DOL, indicated that the matter had been referred to him for a comprehensive reexamination and

review of the case file and to respond to a letter Epstein had written on June 22, 2005 (which is

not in the record).  Pannocchia stated as follows:

I recognize that the May 22, 2000 and June 5, 2000 facsimile cover sheets addressed to the USPS demonstrate that you attempted to notify and involve the USPS in the settlement arrangements.  My review of the file discloses no responses to those notices.  I certainly regret that this matter does not appear to have been promptly responded to.  Notwithstanding the apparent failure of the

---

[8]    The printed letter listed the figure as $140,552.94, but it was changed by handwritten correction to $151,576.70.

[9]    Although the letter is stamped "JUN 19 2005," this date cannot be correct as Pannocchia's letter responds to a letter from Epstein dated June 22, 2005.  Defendant's index to his appendix indicates the letter is dated December 19, 2005 (Docket No. 30 at 13).  That date cannot be correct either because Epstein's response to Pannocchia's letter is dated July 26, 2005.  Based upon the sequence of events, it seems likely that the letter was actually dated July 19, 2005.  Resolution of this issue is not required, however.

USPS to respond to your notices, the terms of § 8132 are quite clear in prohibiting an attorney from distributing any funds from a settlement covered by this provision **"without first satisfying or assuring satisfaction of the interest of the United States."**  It appears from your settlement sheet and subsequent correspondence in the file that you have distributed a portion of the settlement to you and/or your firm as its fee for representing Ms. McMonagle.  I see no evidence in the file that prior to doing so (or for that matter at any time since then) that you have satisfied or assured the satisfaction of the interest of the United States.  Thus, it appears that [the] distribution of funds, including payment of an attorneys fees, was inconsistent with the specific provisions of § 8132.

I have also reviewed the correspondence and documents in the file concerning the proper calculation of the amount of the government's statutory right to a refund in this matter.  Regrettably, I must apologize for the fact that the advice given you by the USPS and this Department concerning the proper calculation of the refund was incorrect and does not appear to reflect a proper interpretation of the provisions of the regulations implementing §§ 8131 and 8132 of the FECA...  The regulations require the entire present value of the structured settlement to be reported as the gross recovery.

While the government does not contest your right to receive an attorneys fee, since that is a matter between you and your clients, the instructions in the regulations as to how to calculate the appropriate refund to the government from any settlement do not abrogate the clear obligation in the statute to assure the satisfaction of the interest of the United States prior to making any refund.  The reference to deduction of costs and attorneys fees in the statute once money is received, serves mainly as an accounting principle for calculating the refund amount to be paid to the Government *prior to the release of any subsequent distributions, including attorney's fees...*

...

As of July 8, 2005, the OWCP has disbursed $340,560.35 in compensation to and on behalf of your client.  Enclosed for your reference are printouts listing each payment.  In the interest of reaching a reasonable conclusion, once we have determined the appropriate amounts to list as the gross recovery we are willing to provide your client the option of calculating a Statement of Recovery based upon disbursements at the time of the settlement ($172,191.75) or based upon present disbursements.

If your client were to elect to file a Statement of Recovery based upon disbursements at the time of settlement, the likely result would be a smaller refund than using current disbursements but also a substantial credit against future

benefits that will cause Ms. McMonagle to have received a substantial overpayment of FECA benefits that would have to be adjudicated by OWCP. Utilizing current disbursements would likely result in a larger required refund without any surplus, but likely would not result in Ms. McMonagle having any of her previous FECA benefits treated as an overpayment.

Once the Statement of Recovery has been finalized, a mechanism for repaying the United States will have to be agreed on to avoid the necessity of our taking action to collect the required refund. While we would hope to be able to agree on an equitable arrangement to do so, it is clear that you, your firm and your client Ms. McMonagle, are each responsible for repaying the United States.

(Def.'s App. Ex. L at 2, 4).

On July 26, 2005, Epstein responded to Pannocchia's request and informed him that the present value of the settlement did not include $70,000 payable to Mr. McMonagle, and the attorney's fees of $210,000 represented his fee based on Mrs. McMonagle's portion of the recovery and no fee for the $70,000 which was recovered in the consortium claim. (Pl.'s App. Ex. 1, Attachment G.)

On December 29, 2005, the DOL approved the Statement of Recovery for the settlement executed by Leslie McMonagle and William McMonagle, as Leslie McMonagle's representative, and that Statement of Recovery agreed that $114,794.50 was due the United States as a result of Ms. McMonagle's settlement with Bell Atlantic. On that same date, Gertrude Gordon sent Epstein a letter notifying him of the refund due and his obligation to pay it. (Pl.'s App. Ex. 1, Attachment L.)

Epstein notes that Ms. McMonagle received FECA benefits in varied amounts from shortly after her February 1996 work-related injury until the spring of 2006. As a result of those payments and her concomitant receipt of structured settlement payments, an overpayment of compensation was created, and the government notified her of its claim for $158,549.19 on April

13, 2006.  (Def.'s App. Ex. B.)

On July 13, 2006, Leslie and William McMonagle filed a bankruptcy petition in the

United States Bankruptcy Court for the Northern District of Ohio under Chapter 7 of the

Bankruptcy Code.  (Lindsay Aff. ¶¶ 3-4.)[10]  On Schedule B of their petition, the McMonagles

identified the GE Capital Assurance Annuity that resulted from the third-party settlement with

Bell Atlantic as a asset of the bankruptcy estate, and on Schedule C they claimed an exemption in

100% of that annuity.  (Lindsay Aff. ¶ 5.)  On Schedule E, they identified the United States as

having two priority claims against them, one in the amount of $114,794.50 related to the FECA

refund claim, and the other in the amount of $158,549.19 related to the FECA overpayment

claim.  These claims were identified as having priority status and were not identified as disputed,

contingent or unliquidated.  (Lindsay Aff. ¶¶ 6-7; Def.'s App. Ex. C.)

On May 1, 2006, approximately two months prior to the filing of their bankruptcy

petition, the McMonagles entered into a repayment agreement with the DOL with regard to the

FECA overpayment claim.  (Lindsay Aff. ¶ 8; Def.'s App. Ex. H.)  The United States filed a

proof of claim in the bankruptcy proceeding asserting a general unsecured claim in the total

amount of $273,343.69, which consisted of the FECA refund claim in the amount of $114,794.50

and the FECA overpayment claim for $158,549.19.  (Lindsay Aff. ¶ 9; Def.'s App. Ex. D.)

On February 9, 2007, Epstein filed a proof of claim in the bankruptcy proceeding

asserting a general unsecured claim in the amount of $114,794.50 relating to potential

contribution or indemnification rights he may have against the McMonagles regarding the FECA

refund claim.  (Lindsay Aff. ¶ 11; Def.'s App. Ex. F.)  On March 23, 2007, the Chapter 7 trustee

---

[10]     Def.'s Br. (Docket No. 30), following Ex. L [pp. 112-14].

filed a motion to compromise that proposed to pay over $40,000 of the McMonagles' stream of payments from the annuity to the trustee.  On April 19, 2007, Epstein filed an objection to the trustee's motion, asserting that $40,000 could not be made available to the trustee because the United States has a first priority statutory lien in the annuity's stream of payments pursuant to § 8132 of FECA.  (Def.'s App. Ex. G.)  The United States did not file an objection or any response to the trustee's motion.  On April 26, 2007, the Bankruptcy Court overruled Epstein's objections and approved the trustee's motion.  (Lindsay Aff. ¶¶ 12-15.)

On November 29, 2006, the McMonagles were granted a discharge of their debts pursuant to § 727 of the Bankruptcy Code.  (Lindsay Aff. ¶ 16.)  Mark Lindsay, Epstein's attorney in the bankruptcy case, notes that it appears that the discharge will operate to discharge the McMonagles' liability for the two government claims.  (Lindsay Aff. ¶ 17.)

The United States asserts that, to date, no portion of the refund due the United States from the settlement of $114,794.50 has been paid by either Richard Epstein or Leslie McMonagle.  (Gordon Aff. ¶ 5.)  Epstein responds that he tendered a check for $7,160.63 in July 2000, but the United States returned it to him.

Procedural History

Plaintiff filed this action on May 18, 2006, seeking $114,794.50 in reimbursement of FECA funds, plus interest and attorney's fees, pursuant to § 8132.  On July 25, 2006, Defendant filed a third-party complaint against Leslie McMonagle (Docket No. 6).  On January 26, 2007, McMonagle filed a Notice of Automatic Stay, indicating that she had filed a bankruptcy petition in the United States Bankruptcy Court for the Northern District of Ohio on July 13, 2006 (Docket No. 21).  On April 2, 2007, Plaintiff filed a motion for summary judgment.

Standard of Review for Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Disbursement of Settlement Proceeds Barred by § 8132

FECA is the workers' compensation statute for federal employees. Enacted in 1916, FECA establishes a comprehensive and exclusive compensation scheme under which federal employees or their survivors receive benefits, regardless of fault, for employment-related injuries or deaths. FECA provides that the United States "shall pay compensation for disability or death of an employee resulting from personal injury sustained while in the performance of his duty." 5 U.S.C. § 8102(a). A wide range of benefits are provided for work-related injuries covered by

FECA, including payment of total or partial wage loss compensation, schedule awards for permanent loss or loss of use of specified members of the body, related medical costs, appliances or supplies prescribed by a physician and vocational rehabilitation.  5 U.S.C. §§ 8103-13.

Under FECA, the Secretary of Labor has the sole authority to administer the payment of benefits, adjudicate claims, decide all questions arising under the Act, and promulgate the regulations necessary for the administration and enforcement of the Act.  5 U.S.C. §§ 8124(a), 8145, 8149.  The Secretary has delegated this authority to the Director of the OWCP, who is responsible for the administration and implementation of the Act.  20 C.F.R. § 10.1.

FECA provides that:

> If an injury or death for which compensation is payable under this subchapter is caused under circumstances creating a legal liability in a person other than the United States to pay damages, and a beneficiary entitled to compensation from the United States for that injury or death receives money or other property in satisfaction of that liability as the result of suit or settlement by him or in his behalf, the beneficiary, after deducting therefrom the costs of suit and a reasonable attorney's fee, shall refund to the United States the amount of compensation paid by the United States and credit any surplus on future payments of compensation payable to him for the same injury.  No court, insurer, attorney, or other person shall pay or distribute to the beneficiary or his designee the proceeds of such suit or settlement without first satisfying or assuring satisfaction of the interest of the United States.  The amount refunded to the United States shall be credited to the Employees' Compensation Fund.  If compensation has not been paid to the beneficiary, he shall credit the money or property on compensation payable to him by the United States for the same injury.  However, the beneficiary is entitled to retain, as a minimum, at least one-fifth of the net amount of the money or other property remaining after the expenses of a suit or settlement have been deducted; and in addition to this minimum and at the time of distribution, an amount equivalent to a reasonable attorney's fee proportionate to the refund to the United States.

5 U.S.C. § 8132.  As the Supreme Court has recognized:

> Section 8132 imposes only two conditions precedent to an employee's obligation to "refund ... the amount of compensation paid by the United States."  The first is that the employee must have suffered an injury or death under circumstances

creating a legal liability in a third party to pay damages.  The second is that the employee or his beneficiaries must have received money or other property in satisfaction of that liability.

United States v. Lorenzetti, 467 U.S. 167, 173-74 (1984).  In Lorenzetti, the Supreme Court held that the United States' right to reimbursement does not depend upon the nature of the damages received by a FECA recipient from the third-party tortfeasor, because the statute's plain language requires repayment whenever the FECA recipient obtains "money or other damages" from a third-party tortfeasor.  Thus, when Lorenzetti, an FBI agent injured in an automobile accident, recovered non-economic losses (for pain and suffering) from the driver of the other automobile, the government could recover from Lorenzetti, even though the FECA payments it had made to him were for medical expenses and lost wages.

In applying Lorenzetti, the Court of Appeals for the Eight Circuit held that the plain language of § 8132 creates joint and several liability on the part of the FECA recipient and his attorney.  Thus, when an attorney (Stacker) accepted a damage award from a third-party tortfeasor (General Electric), deducted his fee and forwarded the remainder to the FECA recipient (Green) without protecting the government's right to reimbursement, Stacker became jointly and severally liable with Green for the FECA reimbursement.  Green v. U.S. Dep't of Labor, 775 F.2d 964, 970 (8th Cir. 1985).

The record reflects that Epstein accepted a portion of an award of $230,000 from Bell Atlantic, the third-party tortfeasor, deducted the costs of suit and an attorney's fee of $210,000 (of which he forwarded half to Rice) and then attempted to send the remaining amount of $7,160.63 to the United States.  The United States contends that, as a result, Epstein became jointly and severally liable with McMonagle for the government's reimbursement of its FECA

13

payments to her.

> Epstein states that:
>
> From the upfront cash of $230,000.00, I have never made any distributions or payments to Leslie McMonagle or any designee.  The only deductions from the upfront proceeds of $230,000.00 were for attorney's fees of $105,000.00 to Routman, Moore, Goldstone & Valentino, and Ronald J. Rice in the amount of $105,000.00, costs of $6,573.83 and a check dated July 13, 2000, to the government with a statement of recovery for $7,160.63 payable to OWCP which was subsequently returned by the government and is currently in escrow with the balance of the proceeds of $6,495.94.

(Epstein Aff. at 2-3.)

Thus, he argues that all monies paid were for fees and costs to the attorney and not to the "beneficiary or her designee."  He contends that, if Congress had intended to prohibit payment of attorney's fees, it would have repeated the word "attorney" after the phrase "pay or distribute."

The United States responds that Epstein's argument would eviscerate, if not undermine, the very purpose of the language added in the 1974 amendments: "No court, insurer, attorney, or other person shall pay or distribute to the beneficiary or his designee the proceeds of such suit or settlement without first satisfying or assuring satisfaction of the interest of the United States." As noted by the court in Green:

> The legislative history of the 1974 amendments to the FECA shows that this sentence was added to expedite reimbursement by granting the government a lien on the proceeds of any third party recovery to the extent of the government's reimbursement rights.  Any person who deals with funds against which the government has a lien under section 8132 is thus liable to the United States for conversion.  We agree with the district court that Stacker became liable to the government under section 8132 when Stacker accepted Green's damage award from General Electric, deducted the attorney fee and forwarded the remainder to Green without protecting the government's reimbursement rights.  We therefore affirm the district court's decision that Green and Stacker are jointly and severally liable to reimburse the government.

775 F.2d at 970 (footnote and citations omitted).

14

In addition, it is noted that FECA provides that a recipient is allowed to retain "at the time of distribution, an amount equivalent to a reasonable attorney's fee **proportionate to the refund to the United States**." 5 U.S.C. § 8132 (emphasis added). Epstein has not explained how deducting $210,000 from the upfront payment for attorney's fees and forwarding $7,160.63 to the United States produced a result consistent with the terms of the statute.

Epstein states that:

> Having fully informed the government of the terms of settlement and the statement of recovery, I was only awaiting clarification from the government as to how the remainder of the lien would be satisfied, i.e., from crediting future compensation and/or from the proceeds of the $826,782.00 guaranteed payment or both.

(Epstein Aff. at 3.)

Regulations promulgated by Secretary of Labor ("SOL") explain how to calculate the amount due to the United States from a third-party recovery to reimburse the United States for FECA payments paid by the OWCP:

> The refund to the United States is calculated as follows, using the Statement of Recovery form approved by OWCP:
>
> (1) Determine the gross recovery as set forth in § 10.712;
>
> (2) Subtract the amount of attorney's fees actually paid, but not more than the maximum amount of attorney's fees considered by OWCP or SOL to be reasonable, from the gross recovery (Subtotal A);
>
> (3) Subtract the costs of litigation, as allowed by OWCP or SOL (Subtotal B);
>
> (4) Subtract one fifth of Subtotal B from Subtotal B (Subtotal C);
>
> (5) Compare Subtotal C and the refundable disbursements as defined in § 10.714. Subtotal D is the lower of the two amounts.
>
> (6) Multiply Subtotal D by a percentage that is determined by dividing the gross

> recovery into the amount of attorney's fees actually paid, but not more than the maximum amount of attorney's fees considered by OWCP or SOL to be reasonable, to determine the Government's allowance for attorney's fees, and subtract this amount from Subtotal D.

20 C.F.R. § 10.711(a).  The regulations further state that, with respect to a structured settlement (that is, one providing for receipt of funds over a specified period of time), "the gross recovery to be reported is the present value of the right to receive all of the payments included in the structured settlement...."  20 C.F.R. § 10.713.  These regulations became effective on January 4, 1999.  Claims for Compensation under the Federal Employees' Compensation Act, 63 Fed. Reg. 65284-01 (Nov. 25, 1998).

As an experienced plaintiff's attorney, Epstein cannot rely upon his claimed ignorance of these regulations, which were in effect for approximately a year and a half prior to the time he negotiated the structured settlement for Leslie McMonagle.  Therefore, this argument is unavailing.

With respect to the bankruptcy proceeding, Epstein argues that he attempted to voice his disagreement with determinations made therein and the positions the United States took regarding the money Leslie McMonagle owed the United States as a result of the third-party settlement.  The United States responds that Epstein's disagreements are irrelevant to this case, as this Court has no jurisdiction over the bankruptcy proceeding (which took place in the Northern District of Ohio).  Epstein has not responded to these arguments.  The United States correctly observes that Epstein should present his disagreements with the Bankruptcy Court's determinations in another forum.

Equitable Estoppel

Epstein also argues that the United States is equitably estopped from asserting its right to

16

reimbursement based on its actions and omissions in this case.  The United States replies that

Epstein has not met the high burden required to establish an equitable estoppel defense.

The Court of Appeals has held that the elements of an equitable estoppel claim are as

follows:

> 1) a false representation or wrongful misleading silence; 2) an error in a statement
> of fact and not in an opinion or statement of law; 3) person claiming the benefits
> of estoppel must be ignorant of the true facts; and 4) person claiming estoppel
> must be adversely affected by the acts or statements of the person against whom
> estoppel is claimed.

Fredericks v. C.I.R., 126 F.3d 433, 438 (3d Cir. 1997) (citation omitted).  In addition, when

parties seek to raise equitable estoppel against the government, "we impose an additional burden

on claimants to establish some 'affirmative misconduct on the part of the government officials.'"

Id. (quoting United States v. Asmar, 827 F.2d 907, 911 n.4, 912 (3d Cir. 1987)).

The United States argues that Epstein fails to meet the third, fourth and fifth elements of

this defense, in that: 1) he was or should have been aware of the true facts consisting of the

statute and its regulations, and he even requested that USPS assist him in crafting a structured

settlement, showing he knew of the duty to pay; 2) he has produced no evidence that anyone from

the government misled him in making the calculations or in approving them as accurate, but

rather the record reflects that he was told that USPS was investigating the matter and he went

forward with the settlement without awaiting its approval; and 3) an omission to give advice by

an agency of the government is insufficient conduct to support equitable estoppel.

The Court need not address the second argument because the first and third points are

17

supported by the law and the record.[11]  As noted above, Epstein's claimed ignorance of the law

(and its regulations) is no excuse.  See United States v. International Minerals & Chem. Corp.,

402 U.S. 558, 563 (1971). ("The principle that ignorance of the law is no defense applies whether

the law be a statute or a duly promulgated and published regulation.")  Moreover, neither delay

by the government nor failure to provide legal advice constitutes "affirmative misconduct" for

purposes of equitable estoppel.  See Green, 775 F.2d at 970 ("Although this delay may constitute

negligence by the government, it does not rise to the level of 'affirmative misconduct' required

before this court will consider whether an estoppel defense may be asserted against the United

States."); Cadwalder v. United States, 45 F.3d 297, 299-300 (9th Cir. 1995) (government's

failure to inform plaintiffs that their claim was legally insufficient could not support defense of

equitable estoppel).

Rather than citing to authority in support of his position, Epstein asks the following

rhetorical questions:

> Was the government's refusal to participate in the mediation such affirmative
> misconduct as to invoke the doctrine of equitable estoppel?  Was the
> government's refusal to communicate with Mr. Epstein prior to the clients'
> execution of the general release and his receipt of the upfront money the type of
> affirmative misconduct that would allow the use of this doctrine?  I[s] the
> government's refusal to seek repayment from the party ultimately liable for the
> FECA lien (Ms. McMonagle) at any time this type of affirmative misconduct?

(Def.'s Br. at [10-11].)  The answer to these questions is "no."  The United States has cited

authority that the conduct alleged here rises at most to the level of negligence, which is

---

[11]    The government's contention that Epstein "impetuously relied on his erroneous
calculation" by having his clients sign the settlement a month after it was negotiated rather than
waiting nearly a year for the government's response (which contained inaccurate information) is
a bit of overreaching on its part.

insufficient to invoke the doctrine of equitable estoppel against the government.  Epstein has

cited no authority to suggest otherwise.  Therefore, his equitable estoppel defense is unavailing.

The United States has demonstrated that Epstein made a distribution from a third-party

settlement without first satisfying the amount due to the government under FECA.  Epstein has

not pointed to the existence of a genuine issue of material fact, and his attempt to reinterpret the

words of the statute is not in keeping with the cases interpreting the statute's plain language and

concluding that an attorney will be held jointly and severally liable along with the FECA

recipient.  In addition, he has not demonstrated that the defense of equitable estoppel is

appropriate in this case.  Therefore, the motion for summary judgment filed by the United States

seeking judgment in its favor in the amount of $114,794.50 should be granted.[12]

For these reasons, it is recommended that the motion for summary judgment submitted on

behalf of Plaintiff (Docket No. 25) be granted.

Within ten (10) days of being served with a copy, any party may serve and file written

objections to this Report and Recommendation.  Any party opposing the objections shall have

seven (7) days from the date of service of objections to respond thereto.  Failure to file timely

objections may constitute a waiver of any appellate rights.

---

[12]      The United States also seeks interest on this amount beginning on December 29, 2005, the date of the letter from Gertrude Gordon to Epstein demanding payment of the government's statutory right of reimbursement under § 8132 (Pl.'s App. Ex. 1, Attachment L).  A regulation provides that, if the refund due the United States is not received within 30 days of a request, interest shall accrue at "the rate of the current value of funds to the United States Treasury as published in the Federal Register (as of the date the request for payment is sent)."  20 C.F.R. § 10.715.  However, the United States has not documented what the rate should be or calculated the total amount due.  In its response to this Report and Recommendation, the United States should submit this information so that the Court can enter a final order including interest.

Respectfully submitted,


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge


Dated: June 7, 2007